Oyez, oyez, oyez, all persons having any manner or form of business before the Honorable the United States Court of Appeals for the Fourth Circuit are admonished to draw an eye and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. All right, please be seated. All right, we are prepared to hear argument in United States v. Sutton and let's see Ms. Renee, we'd be pleased to hear from you. Good morning, may it please the Court, I am Patricia Renee, appearing on behalf of Ms. Margaret Ann Sutton who is appealing her convictions and sentence in this case. We'll start out with, and these are of course various drug and firearm convictions that she suffered, beginning with a conspiracy, as the Court is aware, it requires a knowing and voluntary participation because indeed the government did establish a drug conspiracy involving Mr. Andrews, West, Moore, various, a multitude of people, but Ms. Sutton is not one of those people. What we have regarding Ms. Sutton is essentially a simple single buyer-seller transaction between she and Moore, and this is only because Moore, who is in a conspiratorial relationship with Mr. Andrews, was not able to reach him, and in fact they tried to consummate this deal the day before, she couldn't reach him, she's calling Sutton, Sutton's not responding because she's not part of that. The following day, when the transaction occurred on April 21st, she's again calling, calling, calling, Sutton finally responds to her and says, okay, come over, I have it, and Moore goes over, the transaction occurs. I think that is what's, so obviously that's just one simple single transaction. I think that what's particularly... Your position is that a jury could not conclude from that? I mean, we talk about the trip to California, the supply drugs and all these things, but even if that was all we had, help me understand why we wouldn't understand that that was, or a jury could conclude that that's evidence that she had agreed with Mr. Andrews to distribute narcotics, like the basic premise of the conspiracy. Right, so there's no evidence to support an agreement between she and Mr. Andrews, and I think that what's most telling... Just because there's no evidence that, I don't even understand that, so it was Mr. Andrews's, at least allegedly, the record might show, it was his drugs, right? Correct. And your client distributed, and it's your argument that she stole it? It's my argument that she distributed drugs to Ms. Moore, but they were not the drugs that belonged to Mr. Andrews. They were her own drugs. I don't know whose drugs they were, but I think that what's particular... Your point is a jury could not conclude otherwise. A jury could not conclude otherwise for two reasons. One, the fact that Ms. Sutton had to get Ms. Moore to stop and buy scales in order to weigh the product for her, I think is pretty powerful evidence that she's not involved in a conspiracy to distribute when there are multiple scales inside of Mr. Andrews's home where Ms. Sutton happened to be. So I think that's pretty powerful evidence of lack of a conspiracy. Also Ms. Moore... Help me understand that. Why is that evidence that there's not a conspiracy? She doesn't know everything that's in the house, and therefore she reached no agreement to distribute the drugs? It's not just everything that's in the house, the scales, that's the tool of the trade. And so if you're a part of this trade, you would know where your tools are. And so, and again, Ms. Moore testified that Sutton measured the drugs out of a black bag. The evidence that was found in the house in the clothes hamper, there was no black bag. There was a crown... I thought there was some evidence that they had traveled... I know you contend basically that this was a romantic relationship and not a conspiratorial relationship, but they drove to California together, I thought, to consummate a transaction. And then when Mr. Andres was ill-disposed, I guess he may have been sleeping or whatever, the transaction was executed by Ms. Sutton. And she was at the premises a good deal, and she was a distributor. I think there may have been some evidence before the district judge, this was a bench made a good deal of money. I think the figure that was thrown around, she was making for Mr. Andres $50,000 a month. This was a bench trial, and that was before the district judge. So when you put this kind of evidence together, it transcends buyer-seller relationships or romantic relationships or what have you, and it gets to the point that it's not buyer-seller, it's not romantic, it's a step up, which is co-conspirators in a drug distribution scheme. So specifically regarding that, there's a lot of evidence that the Commonwealth introduced, and it's all the government's evidence, and the evidence, most of it is conflicting, it's contradictory, that's their evidence, which makes the evidence overall equivocal. For example, West testifies, as the court indicated, that Sutton distributed drugs on direct examination, on cross-examination, she said that she characterized Sutton's presence in the home as that of a customer. So this is conflicting evidence from the government. Isn't it the job of the trier fact to resolve the conflicts in the evidence? Well, to a certain extent. But if the trier fact is going to take all the evidence, pour it into a sieve, and sift out all of the evidence that undermines a person's guilt and only save the little clumps and pieces that support a conviction, that overall is equivocal evidence, and also, which is not substantial evidence. Say that last part again. So if they put the evidence in, and they only take out what they believe, and they discard the things that they don't believe, why is that equivocal? It's a difference. It's like the opposite of equivocal. It's a difference when you have defense evidence that's in conflict with the government's evidence. But when the government's own evidence from their own witnesses that the trier fact is has to believe is giving conflicting evidence, some of the witnesses contradict them themselves within the same testimony. For instance, Wes, if she says on the one hand... Is there any case or suggestion that we've had that a witness who conflicts themselves cannot be believed at all? We have... I mean, you've done enough of these trials to realize that, like, at least with a competent cross-examiner, everybody has some degree of inconsistency. That's like the nature of testimony. We have to bear in mind what the legal standard is, which is substantial evidence. And if evidence is equivocal... Evidence in the light most favorable to the government. Correct. And there has to be substantial evidence. So to take that perfect example, if Wes, on the one hand, says Sutton is distributing drugs, then on the other hand, she says, no, I characterized her as a mere customer. You have two competing statements there by the same witness of the government. Inconsistent statements. Right? I mean, those are not inconsistent statements. I mean, you can roll your eyes at me about it. Oh, I'm sorry. I didn't mean to do that. Those are not inconsistent statements, right? You can both be involved in the distribution and be a customer. In fact, like oftentimes in drug conspiracies, that's a common occurrence. That was not the testimony. That can occur, yes, but that was not the testimony. On direct, she equivocally stated that she was helping to distribute. On cross, when pressed on it, she backed away from the statement and changed her testimony into something else. Oh, she was a mere customer. What's the JA site where you say that she disregarded her prior testimony and said that she was wrong? JA 245. As far as the trip to California, the evidence showed that Andres had made multiple trips to California with his drug conspiracy partners on this one occasion right after Sutton had started a romantic relationship with him. Keep in mind, that was only a three-week period of time, and Andres had hired Olive and her boyfriend to drive him to California. Sutton was nowhere around. She was in Tennessee. They stopped in Tennessee to pick her up. I'm looking at JA 245. Can you help me understand where it is that she says, when I said that she was a distributor of drugs, I was wrong. Instead, she's merely, which is the word you used, she's merely a user or a customer. Yes, I'm interpreting her statement. In fact, my point is, she didn't say, oh, in addition to being a user. What she said was that she backed away from her prior statement and she said that she was a mere customer. So, if you're representing that to the court, what I want to understand is, where is it? Judge, on the government's case, I will try to find a specific spot. Not on 245, though, right? We can agree on that? Okay, well, then I have the wrong page number. I'll have to look in my brief, but again, this trip across country is a single trip. She was in a new romantic relationship with him. That's not uncommon that she would go take a trip across country with him, but when they got there, and she didn't drive with them, she was in Tennessee, as I stated, and when they got there, they flew there. Wouldn't it be for the trier fact to determine the purpose of the trip? Well, yes, but it has to be in the context of all of the facts and circumstances. And in the context of these facts and circumstances, a new romantic relationship, he's going to take a trip to California, she goes with him. What about the money that she made for him as a result of her, as a result of that collaboration in a distribution scheme? I mean, she made a good deal of money for Ms. Andres, did she not? She was only involved with him for three weeks. The testimony was that that had happened sometime in March or April. Wes moved out at the end of March, and there was no evidence that Sutton was on the scene before then, so it wasn't even a full month. I'm sure the fact finder can sift through the evidence and decide to believe the evidence that points to a person's guilt and disregard that points to their innocence, but that's at this stage. At the trial court stage, when the trial of the fact is considering all of the evidence, the evidence has to be substantial. It has to be a substantial amount of evidence. And we just really don't have this. We have someone... Ms. Andres was indisposed for whatever reason. Wasn't she the one that executed the drug transaction? Yes, a single buyer-seller transaction she did indeed. At a certain point, these cumulative bits of evidence mail up, do they not? The standard is substantial. If this court believes that these individual little bits of evidence of her relationship with him at that house during a three-week period of time when Mr. Andres had been dealing drugs since 2010 and had been dealing drugs with Wes that he had been in a relationship with for eight to ten years... I know the thread that runs through your case and the general thrust of the case is that this was a romantic relationship and that runs through a lot of the different assignments of error. And there's no evidence that she lived at the house? No, but it was that central question that we have a trier-of-factor to resolve. And here, I think there's a good bit of evidence to support it. The trier-of-fact simply found that she was a very valuable partner in this whole distribution scheme. I mean, the drugs were lying around in plain view on the premises. They were in the living room. They were in the master bedroom. The firearms were within some proximity to the drugs. She was in a position to know a great deal about what Mr. Andres was up to. This is not an innocent association because the evidence of it was strewn throughout the house. Well, respectfully, all of the evidence was found inside of Mr. Andres' bedroom inside of a clothes hamper and two of the three firearms were on the dresser. There was a firearm in the living room and presumably it was in the living room area where Ms. Sutton distributed the drugs to Moore. And there's no evidence that Ms. Sutton was ever in his bedroom. There are no personal items of hers. Her clothes are not in the hamper where his drugs were found. They're not in the closet. There's no evidence that she was ever in his bedroom. And it requires more than her knowledge of his criminal activity. She has to be a voluntary participant in it. And that's the part where there's no evidence that she was a voluntary participant other than the single mirror buyer-seller relationship where she engaged with Ms. Moore. Thank you very much, Judge Rushing. We appreciate it. Okay. And if I may address maybe some of the other issues on my rebuttal, even though I haven't brought them up now. I'm on rebuttal. I'm not saying your arguments aren't good ones. They are, but you have to persuade the trier of fact that they should prevail. That's what's hard about it. But we'll look forward to hearing from you on rebuttal.   Thank you. Ms. Bukhara, let's be pleased to hear from you. May it please the Court. Jacqueline Bishara for the United States. I'd like to start. One question I have for you on the premises conviction. You seem to argue that Ms. Sutton maintained the premises in terms of the drug distribution scheme. And I was sort of puzzled as to why you didn't put more emphasis upon another verb in that statute, which was to use. Because it seems to me that I think this was in line with the Second Circuit. Those verbs are written in the disjunctive. And so any one of them would suffice for a conviction. And it seemed to me that your burden of proof would be significantly less under the word use than it would be under the verb maintain. There's all sorts of evidence of use. I mean, I'm not sure that it makes a difference because the statute, the offense of conviction can be based on any number of basis as long as you prove one of them. But why wasn't your argument in this brief before us more one of use than of maintenance? Your Honor, we did argue at page 36 of our brief. It's not, I guess, the thrust of our argument, but we did argue that a reasonable fact finder could infer. Can you back up a little for me? I want to be sure. Yes, Judge Wilkinson. Can you hear me all right? Okay. At page 36, we did argue that a reasonable fact finder could find that she used or maintained the premises. We did focus on maintain because that's kind of, that's where all of the court's case law has focused is on the maintaining verb. I believe that the Fifth Circuit's decision in Santiago might be the first court of appeals decision to really construe the use provision. But we did also charge, we charged in the alternative in the indictment, that's at JA 46, all of the verbs, we charged those. And we did argue in closing to the district court as the fact finder, that's at JA 543, that any of these verbs would establish our burden of proof here. So you made that argument in terms of use below? We did. So I was just surprised that there wasn't more emphasis on that in the appellate brief. You do agree, I mean, didn't the Second Circuit go on a use theory? The Fifth Circuit in Santiago, I believe? Or, it may be Your Honor is referring to it. It was enough to prove use. Yes, and certainly this is enough to prove use. Whether or not the evidence supported the inference that she lived there, obviously the government's position is that it was enough to infer that she lived there. But even if she didn't live there, that means that she is directing someone to go to this house for the purpose of doing a drug deal. That's classically what the statute is intended to capture. She can be convicted under the statute. The statute seems to indicate that there was some utilization of the premises in some form. Yes. And there are a lot of it. You don't have to be a spouse. You don't even have to be a house guest. As long as you utilize the premises in some way. And the evidence is that the conspiracy operated out of the premises. And so it would be odd to say that the statutory elements of a premises conviction were not met when the operation, when the conspiracy centered its operation around the premises. Yes, Your Honor. And there is evidence that she is, I think in the words of Davis, that she's on the scene even before the controlled by occurs. Both, I'm sorry. I get that it might not be totally implicated here, but we could imagine the word use with sort of a fairly expansive reading such that, you know, my law clerk, Will, here, he's involved in a drug distribution business and he happens to be running it out of, like, this courthouse. This is hypothetical, I think. That he would be using this courthouse in some colloquial sense, right? Or, you know, if you, if he instead ran it out of a 7-Eleven or, like, literally anywhere he was, you know, if he's in a tent, right, whatever it is, he's using whatever location he's in. Is that colloquial sense right? I mean, can we interpret it so broadly that he would be guilty of using the federal courthouse, in my hypothetical, as a drug premises? I mean, that seems like an odd reading, but I think you could read the word use that way, or do you think there's a limitation that we ought to include? So, you need to look at the two mens rea elements of the statute, right? We have knowing, I don't know if Your Honor might be getting at kind of concerned that Your Honors might be implicated as aiders and abettors or something in this use of the courthouse. I'm good. Okay, all right. I don't know, I'm trying to... He's going to jail, but I'm not. Now, let's start with that premise, right? We also have... I was saying, talk about a use of a federal courthouse. Right. So, then we go to the, for the purpose of requirement, and every court to have looked at this has said, okay, the drug-related purpose has to be a specific purpose, but it doesn't have to be the sole purpose. And then we weigh kind of like, how significant of a purpose is it? And so, where courts have not sustained convictions, it's because... Where do I get the weighing from? Help me understand why I get the weighing, because obviously there are lots of us that use this courthouse for lots of different reasons, right? But Will might be using it, like, predominantly for his drug business? Yes. And like, how do I... Am I weighing just his use or am I weighing all of our uses? So, where courts have looked at this in the context of residential premises, right, they've looked at, okay, the primary purpose was residential and the distribution of drugs was maybe incidental. Those cases all deal with a particular individual, so I understand that's sort of distinguishable. But that's why I would suggest that I hope the primary purpose of this location is to do the court's business, not to do drug dealing. I think that the question, I mean, use can... You certainly don't want use to be established simply from the fact that someone makes one visit and moves out. But I think use would have to be of a regular sort and of enough significance to constitute utilization in some way. And the question of, I'm not sure that we can sketch it all as to what use does and does not matter on appeal, but it seems to me that you rely on your trial judges here to decide when the uses of sufficiently substantial nature constitute use of the premises. And here I say the premises was not just something that she visited upon an occasional basis to pick up drugs. It was the center of the whole operation. Yes, Your Honor. And it was the operational nerve center of it. So, under these facts, if that isn't use, then the verb serves, the verb that Congress included serves no purpose. See what I'm saying? Yes, we agree. And of course, the other evidence that is recovered from the house supports that that's what the house was being used for, right? We've got the baggies for packaging drugs. We've got the scales. Hundreds of thousands of dollars worth of meth in the house. That's all consistent with... Yeah, you go even further and say that the regularity of her contact and the profitability of it and the extensive time that she spent and all the rest arises to the level of maintenance as well. All I'm suggesting to you is that Congress included the verb use for a reason and that was that it did not want full-scale maintenance necessarily to be a precondition or serve as the sole element of conviction. Yes, we know that because Congress expanded the statute to add these verbs in 2003 and it's noticeably different from the guideline enhancement which you all, I suspect, might be familiar with as well which only applies to maintaining a drug premises. This is notably broader. Can I ask you about a different charge? The possession with intent to distribute the marijuana. Your brief kind of lumped everything in the house together because you had a lot to cover but I wanted to get your theory on how she's accountable for the marijuana more particularly if it's conspiratorial or if it's an argument that she actually possessed it herself. I think there's enough to find constructive possession because we start with the trip to California we know she went with Andres where he gets both the meth and the marijuana he brings it back to the hotel and Olav testified it's a lot of marijuana and he shows it to them and then on the drive back from California to Virginia the puzzle box that's kind of a centerpiece of this case is sitting in the back of the truck and then when officers execute the search warrant they find almost 10 pounds of marijuana it's in the same puzzle box and it's sitting adjacent to the bathroom door in such a way I think the testimony was basically you would trip over it if you weren't watching where you were going so that's enough to infer that she knew about the marijuana and kind of had control over it but certainly the court could affirm this conviction based on co-conspirator liability under Pinkerton The puzzle box, it's such a great law school hypothetical someone has created a box just for this one guy and only this one guy knows how to open the box the testimony is no one else knows how to open the puzzle box and she's never selling the marijuana so she may be constructively possessing it with intent to distribute because she can't access it I was looking for a picture of the puzzle box in the record, I didn't see one just because I'm curious It is in the record, it's not in the JA but we did submit it as an exhibit at trial and I'm happy to supplement if you want to see the picture of it and I'm not saying you can't get there you might be able to get there anyway, but I wondered if you were relying on some sort of conspiratorial assignment of responsibility to her or if you had a more direct route that you were pushing Our brief focuses on direct liability we did argue Pinkerton to the district court in closing so the court could affirm on either basis Do you accept the premise of Judge Rushing's question that the trier of fact could only find that only he could open the box I mean it seemed totally clear to me I get that there's some suggestion that he was the only one that could open the puzzle box but are we required to take that I mean obviously we don't have findings of fact here but if we construe the evidence in light much favorable to the government is that a fact that we would have to accept in the premise or is that unknown it's unknown there's no testimony as to whether Sutton knew or didn't know how to open the puzzle box you could infer from the fact that they're in this romantic relationship and she goes and retrieves the math and weighs it out that you know there is a suggestion that only he can open it and where does where does that come from and why do we how do we discount that there was testimony basically as Judge Rushing alluded to that he had it created for this special purpose for storing his drugs but to the extent that Sutton is involved in this conspiracy which viewing the evidence cumulatively and in the light most favorable to the government presumably she would be in on this other purpose of distributing marijuana and also the court can infer just given the volume of marijuana right agent Faddis testified this is definitely a distribution quantity under a reasonable foreseeability standard is that correct yes the court can affirm based on Pinkerton also based on a reasonable foreseeability it's reasonable foreseeable and in furtherance of the conspiracy yes and your theory is that certainly reasonable reasonably foreseeable because she knew everything that was going on yes it wasn't it wasn't much that occurred in his activities that wasn't reasonably foreseeable yes I mean it wasn't much that went on there that she didn't know about we agree with that characterization your honor I would like to respond to Judge Richardson maybe you already found this JA citation about the drug customer testimony whether West kind of went back can you explain we disagree with that characterization if you start reading on JA 256 the testimony is so Sutton's counsel asked Wes how often did you see Sutton over at Danwood Drive three to four times per week and she was there to get from what you understood and saw you saw her getting meth for herself and for herself from Vic which is Andres right and then Wes responds I don't know if it was for herself but yes and then that's when the next question or complete question starts by talking about before you moved out right so this is before temporarily the questions are referring to the time before the defendant moved in right yes that's correct but anyway this does not undermine the inference that she was getting meth to distribute it and that is what Davis affirmatively testified to on direct unless thank you very much we appreciate it thank you we ask that you affirm Ms. Renee we are happy to hear from you in rebuttal thank you and I thank my colleague for pointing out the page number and I had cited to the wrong page in my brief and that's why I couldn't find it but I did find it while I was waiting and so indeed it does start out on page 256 but it spills over into page 257 which is where I was getting at we end at the bottom of starting on page 256 on line 16 where Wes has asked how often did you see Margaret Sutton over at the Danwood Drive residence before you moved out three or four times a week and you saw her getting methamphetamine for herself from Vic meaning Mr. Andres right and she goes I don't know if it was for herself but yes then the question okay just like all of the other and then Sutton says yes pictures of people talking about the other customers who would come there but over on the top of page 257 where Wes answers yes ma'am and beginning on line 2 the question is so she was one of the customers if you will who would come over the answer is yes ma'am and then further down on page 257 beginning at line 12 talking about when she first saw Sutton coming over and I think you testified that you met her in the fall of 2020 six months or so before you moved out is that right yes ma'am so she had seen Sutton coming over to the house for six months at least before this so called raid occurred as a customer along with all the other customers who were coming over and again this relationship she begins with Andrews starts after Wes moves out which is the end of March the raid occurs on April 21st so we're talking like a three week period so this information from Fann who says after stating yes I knew a guy who told a guy and through the grapevine someone said that you know she was you know somebody to look out for people were getting in trouble if they were like you know interact with her in any way and that's when Fann says oh yes and I was told or Andrew says yes she made a lot of money from me the month before she wasn't even there the month before and again of course Fann says everything was just a big blur so yes we can decide to again pick and choose the fact finder can't pick and choose what evidence they think is believable and what is not but when the government's own evidence is in conflict with each other I don't think that amounts to substantial evidence and we spend so much time the government does arguing about sentence knowledge knowledge is only one factor there's got to be more than just her knowledge that there's a conspiracy going on she has to be participating and there's no evidence that she was anything other than a customer and again when Andrews arranges his trip to California that starts in Virginia she's nowhere around she's in Tennessee and as far as maintaining the drug premises even if under the word use it has to be for the purpose of there's no of any clothes personal items anything like that of hers at Andrews house particularly in that bedroom where all of those drugs were found and in order to even use the property for their purpose the drug distribution has to be one of the specific purposes her specific purpose for being there was to spend time with her boyfriend Andrews and I see that I have a few seconds thank you very much I'm sorry your court appointed and I want to express the appreciation of the court for your argument and the careful and conscientious approach that you've taken toward it and thank you both and my colleagues will come down and shake your hands and if you would come up and give me a fist bump I would appreciate it thank you thanks to you both thank you
judges: J. Harvie Wilkinson III, Julius N. Richardson, Allison J. Rushing